1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CAROL CHAMPOMMIER, and ERIC AVERY FELDMAN, individually and as Successors-In-Interest to ZACHARY CHAMPOMMIER, deceased,<br><br>      Plaintiffs,<br><br>   v.<br><br>UNITED STATES OF AMERICA,<br><br>      Defendant. | Case No. CV11-10538- MWF (PJWx)<br>[Related Case No. CV11-3913 (Closed)]<br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

_____

   This action seeking relief under the Federal Tort Claims Act (the "FTCA"), 28 U.S.C. §§ 1346(b), 2671 *et seq*., arises out of the June 24, 2010 shooting of Zachary "Zac" Champommier by Special Agent Peter Taylor LoPresti in a retail shopping center parking lot.  Champommier died from the gunshot wound he sustained that night.

   Plaintiffs' Complaint was filed on December 21, 2011.  (Docket No. 1).  On April 25, 2012, the Court (the Honorable Jacqueline H. Nguyen, then-United States District Judge) denied the government's motion for summary judgment, ruling that genuine issues of material fact had to be resolved by the trier of fact.  (Docket No. 36).  The

1  Court rejected the government's argument that an assault with a car was *per se*
2  justification for the use of deadly force.  (*Id.* at 11:1-4).

3  The Court entered a Final Pretrial Conference Order on March 21, 2013.  (Docket
4  No. 76).  Champommier's parents, Carol Champommier and Eric Avery Feldman,
5  individually and as successors-in-interest, assert claims for wrongful death (negligence)
6  and battery.

7  The matter came on for trial before the Court sitting without a jury on March 26,
8  March 27, March 28, March 29, April 1, April 2, April 3, and May 23, 2013.  Following
9  the presentation of evidence and argument, the parties filed supplemental briefs, after
10  which the matter was taken under submission.

11  Having carefully reviewed the record and the arguments of counsel, as presented
12  at the trial and in their written submissions, the Court now makes the following findings
13  of fact and reaches the following conclusions of law pursuant to Rule 52 of the Federal
14  Rules of Civil Procedure.  Any finding of fact that constitutes a conclusion of law is also
15  hereby adopted as a conclusion of law, and any conclusion of law that constitutes a
16  finding of fact is also hereby adopted as a finding of fact.

## I. <u>FINDINGS OF FACT</u>

18  1.  On June 24, 2010, members of a Drug Enforcement Administration
19  ("DEA") Sensitive Investigations Unit ("SIU") task force executed a search warrant in
20  the San Fernando Valley area.  After successfully completing their duties, the agents and
21  deputized officers (collectively "officers") drove to a public parking lot to debrief
22  around 9:00 p.m.  The officers were directed to meet in the northwest corner of the
23  parking lot.  The location of the debriefing was chosen by DEA Special Agent Pullen.

24  2.  It is not an uncommon practice or a deviation from agency procedures to
25  arrange for a debriefing in a public location like a retail parking lot.

26  3.  The SIU task force included: Detective Joseph Chavez (Los Angeles Police
27  Department ("LAPD"), Deputy Alfonso Serrano (Los Angeles Sheriff's Department
28  ("LASD")), Deputy Mark Brewster (LASD), DEA Special Agent Jonathan Pullen, DEA

Special Agent Eric Kischer, DEA Special Agent Sean Fromson, DEA Special Agent Samantha Pasanello, DEA Special Agent Peter Taylor LoPresti, and Special Agent Jennifer Caruth (Internal Revenue Service ("IRS")).  All of the officers were acting under color of federal law and on behalf of the United States of America during the events giving rise to this trial.  In these Findings of Fact and Conclusions of Law, the Court refers to the law enforcement witnesses by their titles at their respective agencies.  Sometimes during trial or in documents, the members of the Task Force were referred to as Task Force Officers.  All of the Task Force Officers had distinguished law enforcement careers.  None had a record of any improper use of force.

4.    In particular, Special Agent LoPresti was described as conscientious, devoted to his career, well-trained, and respected by his peers and supervisors.  Based on Special LoPresti's testimony, the Court accepts this view and notes that Special Agent LoPresti appeared on the stand as calm, level-headed and not likely to shoot in fear or anger.  Special Agent LoPresti had never fired his weapon except in training.

5.    Champommier was an 18 year-old high school graduate who lived with his mother.  Earlier in the day, Champommier arranged through a social networking site to meet a new acquaintance, Douglas Ryan Oeters, at the same public parking lot around 9:30 p.m. that night.  This was to be their first in-person meeting.  Champommier told Oeters to look for him in a light colored or white sedan.  That night, Champommier was driving his mother's white 2000 Toyota Corolla, which had a manual transmission and front wheel drive.  The Corolla was not equipped with anti-lock brakes.

6.    The parking lot where the events transpired is located at the intersection of Ventura Boulevard and Laurel Canyon Boulevard in Studio City, California.  Laurel Canyon runs north-south and bounds the lot on the east.  Ventura Boulevard runs east-west and bounds the lot on the south, where shops and restaurants are located.  The west border of the lot is bounded by a chain link fence and the north edge of the lot is bounded by foliage.  The parking lot services a number of establishments, including a Chipotle, Vons grocery store, and CitiBank.

### A.     Officers Arrive at the Parking Lot

7.     The officers began to arrive at the parking lot sometime before 9:30 p.m. By the time the officers reached the parking lot, exited their vehicles, and congregated in the northwest corner of the parking lot under a street light, all of the officers were dressed in plain clothes.  Many of the officers removed their DEA vests and gear before exiting their vehicles, while some officers removed identifying clothing after executing the search warrant.  Each officer's vehicle was unmarked, *i.e.* not a black-and-white police vehicle.  As a result, there were no external clues to onlookers that any members of the group were law enforcement officers.  One civilian witness referred to the officers as "bikers."

8.     That night, Special Agent Kischer drove a white Dodge Charger, which he parked in the far west parking lane against the chain link fence.  Special Agent Kischer's vehicle was parked north of a red utility box located along the chain link fence, in the third stall (counting from the north).  The other officers parked east across the driving lane, in the second lane of parking stalls.  Special Agent Fromson parked his Chevy pick-up truck in the northernmost portion of the parking lane, in a triangular spot not designated as a stall.  In the northernmost stall, Detective Chavez's Toyota 4Runner was parked slightly crooked, occupying a portion of the second stall.  Deputy Serrano parked his gray Chevy Impala in the third stall and Special Agent Caruth parked her Silver Mazda 6 in the stall next to it, the fourth stall from the north.  Many of the witnesses referred to the locations of parked cars as points of reference in their testimony.

9.     The officers exited their vehicles and congregated under the street light located between the red box and Special Agent Kischer's Dodge Charger.  The officers locked their cars but left behind items obtained from the earlier search, including drugs and money.

10.     None of the officers were concerned about counter surveillance of their debriefing.

**B.     Oeters Approaches the Officers' Location**

11.     Oeters also arrived at the parking lot before 9:30 p.m.  He parked his car on the east side of the lot, by the Vons market.  After exiting his vehicle, Oeters walked in a westward direction looking for Champommier's vehicle.  Oeters passed the officers, unaware that they were law enforcement, on his path to locate Champommier.

12.     Oeters turned south in the westernmost driving lane and walked toward Special Agent Kischer's white Dodge Charger.  Thinking that it may belong to Champommier, Oeters peered inside the vehicle.  Oeters did not see anyone in the Dodge Charger and continued to walk southward.

13.     The officers noticed Oeters and became suspicious because he was looking in cars without an apparent purpose.  As Oeters walked south, Detective Chavez approached him.  Oeters did not initially recognize Detective Chavez as an officer because he was in plain clothes and feared a violent set-up.  Oeters began to back up and away from the officers.

14.     Detective Chavez then orally identified himself as law enforcement while other officers approached his location against the chain link fence bordering the west side of the parking lot.  Special Agent Kischer also approached Oeters.  The group stood in the fifth and sixth stalls counting from the north – those stalls just south of the red box.

15.     Oeters repeatedly told the officers that he had done nothing wrong and questioned the officers' purpose in approaching him.  The officers described his affect as jittery and nervous.  They testified that he appeared somewhat disheveled.

16.     There was conflicting testimony about Oeters' behavior after Detective Chavez identified himself as an officer.  Specifically, the witnesses diverged in describing the extent of Oeters' non-compliance with officer orders.  Special Agent LoPresti testified that Oeters was not affirmatively complying with officer commands but nothing about Oeters' interactions with Detective Chavez and Special Agent Kischer caused him to draw his weapon.  Other officers testified that they observed physical

resistance to detention but also left their weapons holstered.  That the officers did not draw their weapons in response to Oeters' non-compliance indicates that he posed a minimal physical threat, if any, to the officers and the passers-by.

17.    In response to Oeters' non-compliance or resistance, Detective Chavez and Special Agent Kischer attempted to go "hands on" with Oeters in order to physically detain him.

### C.    Deputy Brewster Arrives at the Parking Lot

18.    Deputy Brewster arrived after the other officers because he initially drove to the wrong debrief location.

19.    Deputy Brewster was wearing a dark blue Hawaiian shirt and denim pants. Like the other officers, his badge was not visibly displayed.  His weight was between 240 and 250 pounds that night, and his height is between 5'8 and 5'9.

20.    When he arrived at the parking lot, Deputy Brewster saw the other officers attempting to detain Oeters against the chain link fence.  Deputy Brewster concluded that he should provide back-up for the detaining officers and parked his Nissan truck quickly in the sixth parking stall from the north in the second parking lane, partially in the parking stall and partially in the driving lane.  The front of his vehicle jutted into the driving lane and faced the chain link fence to the west.

21.    Deputy Brewster exited his vehicle, walked west, and entered the driving lane between the parking lanes without observing whether there was cross traffic.  He testified inconsistently as to the level of urgency he felt when approaching the scene of Oeters' detention, but the testimony of other witnesses suggested he walked somewhat quickly toward Oeters and the other officers.

22.    Deputy Brewster testified that he saw Oeters' right hand reach into his pocket and observed Oeters' affirmative non-compliance with officer orders.  (Although Special Agent Pullen testified that Oeters did not put his hand in his pocket but instead dropped his right hand, this conflicting testimony need not be reconciled.  Whether

Oeters placed his hand in his pocket or dropped his hand is not relevant to the Court's determination of Plaintiffs' FTCA claims.)

23.     Deputy Brewster then drew his weapon, a 9mm Beretta, in response to Oeters' behavior.  He testified that he feared Oeters was reaching for a weapon or drugs.

24.     Deputy Brewster pointed his gun at Oeters and continued to walk west across the driving lane, toward the other officers.  The officers who went "hands on" with Oeters were very close to Oeters' sides – they stood only inches from Deputy Brewster's target.

25.     Deputy Brewster stopped a few feet inside the seventh stall from the north in the westernmost parking lane, south of Oeters and the other officers, facing northwest. He continued to point his gun at Oeters.

26.     Deputy Brewster was the only officer with his weapon drawn at that time.

**D.     Champommier's Vehicle Impacts Deputy Brewster**

27.     Champommier's vehicle approached Deputy Brewster from the south.  *See infra* Section I.G.  While Deputy Brewster testified that he perceived some peripheral movement to his left, he was not consciously aware of an approaching vehicle.

28.     Deputy Brewster described Champommier's vehicle coming close to his left side.  He dropped his left hand toward the hood, maneuvering into a semi-seated position on the driver's side of the hood.  He initially described this action to police interviewers as "vaulting."  Deputy Brewster testified that held his gun in his right hand such that the butt of his gun tapped the windshield.  He could see Champommier in a panicked state, struggling to bring the car into gear.

29.     Deputy Brewster testified that he remained on the hood for one to two seconds before sliding off the driver's side and onto his feet without falling or stumbling.

30.     Deputy Brewster's description of the impact is consistent with the testimony of Detective Chavez, Deputy Serrano, and Special Agent Pullen.  His account is substantially consistent with the testimony of Special Agent Fromson and Oeters.

31.     Deputy Brewster suffered no significant or even minor injuries as a result of the impact with Champommier's vehicle.  He developed no bruises and suffered no lacerations.  He reported only slight tingling at the time of his medical examination, where no injuries were noted.  He later mentioned numbness in his left thigh and tenderness in his shoulder.  His clothes were unscathed and bore no visible damage from the car.  Later damage to Deputy Brewster's clothing was done by medical professionals evaluating him for possible injury.

32.     Investigators did not find any fingerprints, dents, scratches, scuffs, or marks related to the incident on the hood of the vehicle.

33.     The Court accepts the testimony of Deputy Brewster regarding the manner in which he was impacted by the vehicle.  Deputy Brewster's testimony is also consistent with the lack of physical damage to his person, his clothes, and the vehicle.

34.     After the impact, the Toyota lurched forward and stopped a number of times.  Special Agent Caruth and Deputy Serrano testified that Champommier's vehicle appeared to be out of gear after coming into contact with Deputy Brewster.

**E.     Special Agent LoPresti Fires the First Shot at Champommier**

35.     Before the impact, Special Agent LoPresti stood near the center of the sixth stall from the north in the westernmost parking lane, providing support for the officers detaining Oeters.  Special Agent LoPresti was slightly south and slightly east of the group and approximately 13 feet north and slightly west of Deputy Brewster.

36.     Special Agent LoPresti testified that just before the impact, Special Agent Pullen brushed by him on his left side, drawing his attention to Deputy Brewster just in time to witness the collision.

37.      Special Agent LoPresti was unaware of Champommier's vehicle before he turned.  He did not perceive its approach to the impact site and did not witness the speed of the vehicle beforehand.  Nor did he hear tires screech or an engine rev at any point.

38.     His recollection of the impact substantially differed from all other witnesses.  Special Agent LoPresti testified that he saw Deputy Brewster's feet fly out

from under him as Deputy Brewster was launched into the air from the force of the vehicle's impact.  Special Agent LoPresti testified he then saw Deputy Brewster in the air, level with the roof above the windshield.  From this vantage, Special Agent LoPresti testified that he could see the soles of Deputy Brewster's shoes.  He also testified that Deputy Brewster's waist impacted the windshield, followed by his left hip and lower back.  Special Agent LoPresti testified that Deputy Brewster landed on the hood, facing away from Champommier and toward the officers.

39.   Special Agent LoPresti's testimony about Deputy Brewster conflicts with that of all other officers and lay witnesses, including Deputy Brewster himself.  Although the Court finds that Special Agent LoPresti testified truthfully according to his recollection, either his recollection is mistaken or he miserably failed to make an accurate assessment of the true situation at the time he shot.

40.   The impact occurred 13 feet from where Special Agent LoPresti stood.  Special Agent LoPresti stated after the incident that he initially thought the driver would pull over and apologize but failed to do so.  After witnessing the impact, Special Agent LoPresti pivoted slightly and drew his weapon, a Glock 23-40 caliber pistol.

41.   When Champommier's Toyota Corolla reached Special Agent LoPresti, he shot approximately perpendicularly into the driver's side window.  He was about three feet from the vehicle when he discharged his weapon.

42.   Special Agents LoPresti and Fromson and Deputy Brewster all testified that one to two seconds passed between impact and the first shot.

43.   Deputy Brewster's location at the time of the first shot was the subject of conflicting testimony.  Deputy Brewster testified that he was sliding off the vehicle when Special Agent LoPresti fired.  Special Agent LoPresti testified that he perceived Deputy Brewster on the hood when he fired.  Detective Chavez and Deputy Serrano testified that they observed Deputy Brewster on the hood when they heard the first shot.  Oeters testified that Deputy Brewster was off the hood at the time of the first shot.

44.     At the time of the impact, Special Agent Caruth was standing between her vehicle and Deputy Serrano's vehicle, near the driving lane between the third and fourth parking stalls counting from the north.  (*See* Ex. 103-4580).  She testified that she was likely closer to Deputy Serrano's vehicle at the time.  Special Agent Caruth's vehicle was parked directly across the driving lane from the parking stall where first shot occurred (as evidenced by glass shatter).  The parking stall where the first shot occurred is immediately south of the parking stall marked by a sewer grate.

45.     Special Agent Caruth testified that Deputy Brewster's feet reached the asphalt "almost simultaneously" with the noise of the first shot.  (Trial Trans. 10:124:20-23).  According to her testimony, Deputy Brewster slid off the car and onto his feet south of her location.  (Trial Trans. 10:122:4-25).  She further testified that Deputy Brewster was off the hood by the time Champommier's vehicle reached the stall in which her vehicle was parked, which is roughly across the driving lane from the location of the first shot.  (Trial Trans. 10:112:11-15).  Her testimony supports a conclusion that Deputy Brewster was on the ground when the first shot was audible.

46.     The Court finds that at least two seconds elapsed between the impact and the shot, based on the all the percipient testimony, the physical evidence, and the testimony of the experts.

47.     It is therefore evident that Deputy Brewster was sliding off the vehicle at or before the very moment when Special Agent LoPresti fired, allowing him to touch the ground either before or at the moment of the first shot, or at least when the first shot rang out.

48.     The bullet entered Champommier's left arm, passed through his lungs, severed his aorta, and exited his right side.  Champommier ultimately died from the wounds caused by this bullet.

49.     Special Agent LoPresti testified that he fired the first shot to stop a perceived attack on Deputy Brewster.  He testified that he did not perceive any danger to other officers, himself, or civilians in the parking lot – in fact, Special Agent LoPresti

1  was entirely unaware of his colleagues' locations when he discharged his weapon.

2  Special Agent LoPresti further testified that he would not have shot at all had Deputy

3  Brewster been off the hood of the vehicle.

4      50.    No officers or civilians were in the vehicle's path at the time of the first

5  shot.

6      51.    Throughout his testimony, Special Agent LoPresti gave only one reason for

7  shooting Champommier: To protect Deputy Brewster from severe injury or death.  In

8  spite of this insistence, Special Agent LoPresti did not articulate at trial exactly how

9  shooting the driver of a moving vehicle while another officer was on the hood would be

10 helpful to the besieged officer.  And even Special Agent LoPresti recognized that

11 Deputy Brewster's safety would no longer be threatened if he was off the hood and the

12 vehicle was driving away.

13     52.    Therefore, the Court finds that Deputy Brewster was not in immediate

14 danger at the time of the first shot.

15     53.    Nor do standard police practices support the automatic use of deadly force

16 even in the case of the use of a vehicle as an assaultive weapon.  For example, the Los

17 Angeles Sheriff's Department maintains a policy that states that the use of a firearm

18 against a moving motor vehicle is almost always ineffective and that of an assaultive

19 motor vehicle does not presumptively justify the use of deadly force.  It reads, in

20 relevant part:

21

22     This section reinforces the Department's <u>Core Values</u> and underscores the
       reverence for human life.

23

24     The use of firearms against moving motor vehicles is inherently dangerous and
       almost always ineffective . . . .

25

26     A Department member shall not discharge a firearm at a motor vehicle or its
27     occupant(s) in response to a threat posed solely by the vehicle unless the member
       has an objectively reasonable belief that:

28

-11-

- The vehicle or suspect poses an immediate threat of death or serious physical injury to the Department member or another person; AND
- The Department member has no reasonable alternative course of action to prevent the death or serious physical injury.

In the extraordinary instance that a Department member feels compelled to fire at a motor vehicle or its occupant(s), the conduct of the involved personnel shall be evaluated in accordance with sound tactical principles including the following:
- Cover and/or tactical relocation,
- Safe distance,
- Incident command and tactical leadership,
- Coordinated personnel placement,
- Tactical approach,
- Regard for viable target acquisition,
- Due regard for background, including the location, other traffic, and innocent persons,
- Due regard for crossfire,
- Controlled fire and management of ammunition.

(Ex. 296) (emphasis in original).

54.    This policy is typical of the policy of law enforcement agencies. Plaintiffs' police practices expert, Roger Clark, testified that this policy is typical of those currently in effect at law enforcement agencies around the country. Clark testified that over time law enforcement agencies have enacted increasingly restrictive policies governing officers' firing at occupied motor vehicles. The government's police practices expert, Ronald McCarthy, agreed that "the great majority of agencies say don't shoot at vehicles." (Trial Trans. 9:111:22-23).

55.    McCarthy, however, suggested in his testimony that this policy reflected the common-sense conclusion that a bullet could not stop a car, but was not relevant to a decision to shoot a driver. McCarthy testified that assaultive motor vehicles killed twelve law enforcement officers in 2011. In general, the Court regards McCarthy as more persuasive than Clark, but the Court does not view this portion of McCarthy's testimony as consistent with either the logic or text of Exhibit 296.

56.    Special Agents Caruth and Fromson also drew their weapons but did not shoot. Both testified that they would have shot had they acquired a clear angle.

57.     Deputy Brewster testified that, although he could have shot Champommier while he was on the hood of the vehicle, he did not do so because he feared that shooting the driver would place him in even more danger.

58.     No officers voiced any commands to Champommier or otherwise identified themselves as law enforcement at any time before the first shot.

**F.     Special Agent LoPresti Fires Four Additional Shots at Champommier**

59.     Having suffered a mortal gunshot wound, Champommier accelerated away from the officers, driving north and swerving slightly to the east.

60.     Deputy Brewster took a shooting stance north of Special Agent LoPresti, near the Dodge Charger's rear bumper, and shot at Champommier. Deputy Brewster's shot did not hit Champommier, although it struck the vehicle. Deputy Brewster testified that his shot shattered the rear windshield. This shot caused a wide dispersion of shattered glass.

61.     At the time he fired his shot, Deputy Brewster believed it was in defense of fellow officers whom he had earlier seen north of his location. At the time he shot, he did not know where his fellow officers were.

62.      Special Agent LoPresti continued firing at Champommier, discharging another four shots. None of Special Agent LoPresti's remaining shots hit Champommier, but most hit the Toyota Corolla.

63.     Special Agent LoPresti testified that during each of his shots – five in total – he believed that Deputy Brewster remained on the hood of the Toyota Corolla. At least one of the later shots was fired through the rear window toward Champommier. For the very brief time that Deputy Brewster was on the Toyota Corolla, he faced Champommier through the windshield. Had Deputy Brewster been on the Toyota Corolla when that shot was fired, the bullet could have passed through Champommier or the Toyota Corolla and hit Deputy Brewster.

64.     The government's own expert witness, Ronald McCarthy, testified that the final shots fired by Special Agent LoPresti (after the Toyota turned east) were

1   unjustified uses of deadly force because Champommier no longer presented an
2   immediate threat to any officer or civilian.

3        65.    The vehicle accelerated away from the officers and continued to arc to the
4   east, turning down a driving lane parallel to the lot's north boundary.

5        66.    Champommier's vehicle crashed into a parked Infinity Sport Utility
6   Vehicle, knocking the Infinity out of its parking stall and into another car.

7        67.    The officers approached the vehicle, shouting commands.  Champommier
8   attempted to comply, weakly trying to hold his hands in the air.  When the officers
9   concluded that Champommier could not comply due to his injuries, they extracted him
10  from the vehicle and attempted resuscitation.

11       68.    Champommier was later pronounced dead by paramedics who arrived at the
12  scene.

13       69.    The initial DEA cable summarizing the incident the following evening
14  characterized the impact speed as "rapid" and noted that "[i]t appeared Champommier
15  was specifically attempting to strike" the officers.  (Ex. 143).  The cable also stated that
16  Special Agent LoPresti shot Champommier in defense of other officers, not in defense of
17  Deputy Brewster, after he and Deputy Brewster shouted strong verbal commands.  (*Id.*).

18      **G.**    **Path and Speed of the Toyota Corolla**

19       70.    Much of the trial focused on Champommier's conduct on the night of June
20  24, 2010, in an attempt to reconstruct his state of mind and speculate about his
21  intentions.  But Champommier's pre-impact conduct is only minimally relevant to the
22  decisive issues in this case because Special Agent LoPresti testified consistently that he
23  was unaware of Champommier until the moment of impact, and the question for the
24  Court is whether Special Agent LoPresti acted reasonably.

25       71.    Nevertheless, the Court will address the controverted evidence for the sake
26  of the record because it was the source of many, if not most, of the factual disputes
27  throughout the bench trial.  The speed and path of the vehicle are also relevant to the

28

1  ultimate issues because they dictate the time within which Special Agent LoPresti

2  necessarily acted to discharge his weapon.

3      72.    In addition to the percipient witnesses, Plaintiffs called Jon Landerville

4  (accident reconstruction expert), Ronald Scott (ballistics analyst), and Roger Clark

5  (police practices) as testifying experts.  The United States called Timothy Leggett

6  (accident reconstruction), William Lewinski (firearms), and Ronald McCarthy (police

7  practices).  Tracy Peck of the Los Angeles County Sherriff's Department testified

8  regarding the firearms investigation of the incident and subsequent ballistics analysis.

9              **1.    Path of the Vehicle**

10      73.    The expert witnesses agreed that as Deputy Brewster crossed the driving

11  lane and took his position inside the parking stall, Champommier, driving the white

12  Toyota Corolla, approached the area.  The testifying experts diverged, however, when it

13  came to assessing the car's approach to the impact site.

14      74.    Of the testifying officers, only Deputy Serrano was aware of

15  Champommier's vehicle before it reached Deputy Brewster.  He testified that the vehicle

16  approached from the southeast, traveling west from the CitiBank.  He testified that the

17  vehicle was stopped at the time he observed it, facing north.  Deputy Serrano testified

18  that he heard the vehicle rev its engine while stopped and perceived the vehicle's

19  headlights to be on.  After observing the vehicle, Deputy Serrano turned his attention

20  back to the group detaining Oeters.  He testified that he turned away from the vehicle

21  because it posed no particular threat at the time.

22      75.    Jon Landerville, Plaintiffs' accident reconstruction expert, declined to

23  speculate whether Champommier approached from the east, turning right into the

24  driving lane, or from the west, turning left into the parking lane due to the paucity of

25  physical evidence.  Landerville noted, however, that Champommier appeared to be on

26  an arc throughout the encounter that would indicate an approach from the east (arcing to

27  the right), driving in a westerly direction.  He also testified that it is possible

28  Champommier was traveling up to 17 miles per hour during his approach before

perceiving Deputy Brewster in his path and then reacting to Deputy Brewster's presence, braking, and nearing a speed of zero at the point of impact.

76.     Timothy Leggett, the government's accident reconstruction expert, disagreed and concluded that the physical evidence showed the vehicle approached from the west driving east in a swerving manner.  His opinion was based on the tire marks at evidence tag A.  Landerville testified in rebuttal that these marks could only be attributed to a dual wheeled truck, and not the Toyota Corolla.  Leggett disputed Landerville's opinion, testifying instead that the dual marks were a result of "off tracking," which occurs when a rear tire is on an inner path compared to the front tire during a turn.  Once the vehicle straightened out, Leggett testified the tire tracks aligned again.  Leggett conceded that the Corolla would have had to be accelerating at maximum speed during the left turn in order to achieve the "off tracking" he described.

77.     The better view of the evidence, one supported by Deputy Serrano's testimony, is that the vehicle approached from the east, driving west, and turned right into the driving lane to travel northbound.  The experts each offered a plausible scenario to explain the vehicle's arrival at the impact site but the physical evidence alone as presented by the experts cannot be described as conclusive.  However, had the Toyota Corolla been accelerating at maximum speed during its approach, as posited by Leggett, it is likely that one of the officers would have noticed the noise or movement and therefore become aware of the Toyota Corolla prior to its impact with Deputy Brewster.  The Court also has no reason to discredit Deputy Serrano's testimony about the path of travel.  Regardless, whether the vehicle approached from the east or west is not relevant to the Court's analysis because it had no bearing on Special Agent LoPresti's decision to employ deadly force.

78.     It is undisputed that following the initial approach, Champommier drove the vehicle in a northward direction, against the ordinary flow of traffic in that particular driving lane, parallel to the chain link fence, from the southern end of the driving lane.  The closest exit was in the opposite direction.

79.     Apart from Deputy Brewster, no other officers were threatened by Champommier at any time.

### 2.     Speed of the Toyota Corolla

80.     For most witnesses who were focused on the Oeters detention, Champommier's appearance was sudden and without context.  As a result, the percipient witnesses offered conflicting testimony about the perceived speed of the Toyota Corolla before impact, during impact, and at the time of the shooting.  The most significant discrepancies were in testimony about the speed of the vehicle before it impacted Deputy Brewster.

81.     The officers testified to a wide range of possible speeds, strongly informed by auditory input.  Detective Chavez testified that the car sounded as though it was traveling between 20 and 30 miles per hour before the impact, but he did not visually observe the vehicle before it hit Deputy Brewster.  Deputy Serrano also estimated the vehicle to be traveling between 25 and 30 miles per hour prior to impact.  Special Agent LoPresti estimated the car's speed at 10 to 15 miles per hour at the time of impact.  Special Agent Fromson testified that the vehicle was traveling at least five miles per hour throughout the incident.  Special Agent Caruth described the vehicle as traveling between 10 and 20 miles per hour before impact then lurching and bucking after the impact with Deputy Brewster.  None of these accounts were particularly definite in light of the witnesses' limited observations of the vehicle.

82.     Oeters, the other key percipient witness to the incident, gave potentially inconsistent statements about the vehicle's speed.  After stating in a police interview that he saw a white car "fly" towards the group of officers, Oeters repeatedly testified under oath during a deposition that the vehicle approached Deputy Brewster slowly, stopped immediately after contacting Deputy Brewster, and rolled slightly just before stopping when Special Agent LoPresti fired the first shot.

83.     Other percipient witnesses described audible tire screeches or squeals both before and after the impact and gun shots.  These noises led the witnesses to infer that

the car either accelerated or decelerated at particular moments in time.  However, the weight of the evidence does not support a factual finding based on conflicting testimony about the audible noises alone.  Importantly, Special Agent LoPresti testified that he did not hear any tire noises before shooting.

84.  Expert testimony was essential given the contradictory and inconclusive accounts given by percipient witnesses, but the testifying experts also offered differing analysis of the car's speed based on physical evidence.  The experts only agreed that the Toyota Corolla traveled between 12 and 15 miles per hour when it crashed into the Infinity.

85.  Landerville opined that the car was traveling no more than 5 miles per hour when it reached Deputy Brewster based on the lack of damage to the car, the lack of injury to Deputy Brewster or his clothing, and percipient witness testimony regarding the impact.  Landerville further concluded that the vehicle was traveling no more than five miles per hour when Special Agent LoPresti shot Champommier based on a glass dispersion test he performed and physical speed calculations.  In other words, Landerville testified that Champommier was traveling very slowly and stopping before the impact and until the first shot.  Even if the vehicle was traveling at four to five miles per hour at the time it reached Deputy Brewster, Landerville testified that the vehicle had to be decelerating such that it was nearly stopped; any other scenario would be inconsistent with the lack of injury to Deputy Brewster's leg.

86.  Landerville also focused on the tire marks at the scene to support his analysis.  In Landerville's opinion, an accelerating vehicle initially leaves a dark mark as a result of the tire rubber "peeling out."  He testified that as an accelerating vehicle moves forward, the tire mark dissipates.  Tire marks are also influenced by the terrain and the specifications of the vehicle.  Skid marks, as opposed to acceleration marks, are caused by a braking vehicle, and end in a dark mark that terminates abruptly.  Landerville explained that dark coloration results when rubber is heated up by the traction caused by the brake.  The heat and the traction cause the mark to be dark.  The

terminus of movement causes the mark to end suddenly, as opposed to tapering off.
Landerville concluded that the marks starting at evidence tags C and D and terminating
at E and F represent brake marks, where E and F are the ends of the braking event.  He
noted that either the rear or front tires could have left the marks, observing that the
recently-laid asphalt in the parking lot was particularly susceptible to tire marks.  Many
tire marks scarred the surface of the lot.  Landerville contrasted marks E and F with the
mark at evidence tag I, explaining that the later is an acceleration mark that starts darkly
and fades gradually.  Inconsistent gradations are attributable, in Landerville's view, to
the topography of the parking lot and modulation of clutch pressure.

87.    Landerville emphasized that the speed of the vehicle must be examined in
context and with reference to other physical evidence of speed throughout the encounter.
The linchpin of his analysis is the speed of the vehicle when it hit the Infinity.
Landerville testified that the vehicle had to be moving at a high enough speed to displace
a larger, heavier car from its parking spot but slow enough so that no airbags deployed.
The end speed cabins the possible speed of the vehicle before the crash, because tire
marks show that the vehicle accelerated after the first shot and then decelerated, turning
east, before the crash.

88.    Landerville also relied on the glass dispersion at the site of the fatal shot to
support his conclusion that the vehicle was traveling slowly when Special Agent
LoPresti first fired.  The glass scatter caused by the fatal shot was confined to a much
smaller area (about five square feet) than the glass scatter caused by a later shot when
the car was traveling between 15 and 18 miles per hour.  According to Landerville, the
density and restricted size of the glass scatter at the site of the fatal shot indicates that
Champommier was driving far slower than 15 miles per hour.  The fatal shot also left
some glass in the window pane, characteristic of a lower-speed impact.

89.    Landerville conducted an experiment to attempt to verify this conclusion,
using a hammer to break the window of the Toyota Corolla while the car was traveling
at a variety of speeds.  Based on these tests, he opined that the car was traveling faster

than zero miles per hour and slower than five miles per hour when Special Agent
LoPresti first fired his weapon.  Landerville testified that the glass scatter created by a
projectile impacting the Toyota Corolla when it travels five miles per hour is more
dispersed and less dense than the glass scatter created when Special Agent LoPresti's
bullet pierced the window.  Consequently, in Landerville's opinion, the car was going
less than five miles per hour when Special Agent LoPresti fired into the driver's side
window.

90.    Leggett, the government's expert, offered a very different picture of car's
speed.  After examining the same evidence and utilizing similar software and methods,
Leggett concluded that the vehicle accelerated to the point of impact with Deputy
Brewster and traveled faster than Landerville posited as it sped away from the officers.

91.    Leggett testified that the vehicle would have coasted, decelerating prior to
hitting the Infinity at 12 to 15 miles per hour.  Based on this speed, he inferred that the
vehicle rounded the corner, traveling eastward away from the officers at about 20 to 22
miles per hour.  Here he diverges from Landerville, who concluded based on the end
speed that the vehicle rounded the corner at a maximum of 18 miles per hour.

92.    Leggett continued to extrapolate the car's speed by working backward in
time.  Because there were acceleration marks away from the impact site and shooting
site, Leggett opined that the vehicle was traveling between 9.9 and 12 miles per hour
when it impacted Deputy Brewster and 12.5 to 15.5 miles per hour at the time Special
Agent LoPresti shot Champommier.  He reached this conclusion by referencing the
speed of the vehicle when it crashed into the Infinity and his projections of speed as the
vehicle traveled away from the officers.

93.    Leggett testified that the vehicle did not leave any brake marks in the
parking lot.  Rather, he concluded that each mark was caused by acceleration.
According to Leggett, brake marks should not be laterally consistent, but should instead
have dark marks on the edge of each tire.  Since he did not observe dark-edged marks,
he dismissed the possibility that Champommier applied the brakes, creating skid marks.

94.    Leggett testified that the most notable mark began at evidence tag C and ended at evidence tag E, which he believes was an acceleration mark in light of the horizontal gradation of color.  He testified that darkness in the middle and lightness on the outer edges of a tire mark indicates acceleration.  Leggett testified that this mark was unique as compared to all other marks, which he also believes were caused by acceleration.  In order to cause this particular mark, Leggett testified that Champommier had to depress the clutch, put his foot on the gas so that the engine ran at 3000 to 4,000 revolutions per minute (near its maximum capacity), and drop the clutch quickly so that there was no transition of gears and the maximum torque was at the upper line.  In other words, the vehicle would be accelerating at maximum speed.  This causes the tires to spin rapidly, creating smoke and squealing tires.  Leggett admitted that typical acceleration marks start out dark and fade gradually, but testified that this mark was unique because the driver intentionally manipulated the clutch to create noise and sound.  He testified that this is the only way Champommier's vehicle could have left an acceleration mark with those traits.

95.    Leggett also concluded that evidence tag G marked the impact site, whereas Landerville testified that it was caused when Champommier struggled with the clutch.  These opinions are not mutually exclusive in light of Deputy Brewster's testimony that, while he was seated on the hood of the vehicle, he witnessed Champommier panicked and attempting to put the car into gear.

96.    In spite of the quality of the witnesses and the thoroughness of their testimony, the Court cannot determine the cause of each tire mark from the evidence before it.  Nevertheless, the weight of evidence supports Landerville's characterization of events and estimates of speed.  Based on the credible testimony of Deputy Brewster about the impact, the physical evidence, and general principles of physics and accident reconstruction as explained by testifying experts, the Court finds that the Toyota Corolla was traveling at approximately five miles per hour on average at the time of impact and at the time of the first shot.

97.     The Court finds Deputy Brewster's description of the impact to be credible, and in order for the car to have impacted him in the way he described, it had to be driving somewhat slowly.  Notably, Deputy Brewster was uninjured by the impact.  His clothes were unscathed and the hood and bumper of the vehicle bore no dents, scratches, or scuffs from his body.  Had the car been traveling at a faster speed, Deputy Brewster would not have been able to avoid a collision with his knees and execute a controlled roll, sliding off of the vehicle and onto his feet.  Both the vehicle and Deputy Brewster would have sustained physical damage, or at least exhibited physical evidence, if the car was traveling faster than 10 miles per hour.

98.     The sequence and timing of the shooting also necessarily limits the vehicle's speed.  Two seconds elapsed between the impact and the first shot.  The distance between the point of impact and shooting location was approximately 13 feet.  As the vehicle reached Special Agent LoPresti, he shot into the front driver's side window.  Basic physic dictates that the faster the vehicle covered the distance between the two points, the less time Special Agent LoPresti had to draw and fire the pistol.

99.     According to the government's firearms expert, William Lewinski, the average draw and shoot time for a police marksman is about 1.5 seconds in a controlled, self-selected, testing environment where the subject is aware that shots will be necessary.  Here, none of those features were present and no evidence was offered to show Special Agent LoPresti's draw speed (only his shooting accuracy, which has no logical bearing on reaction and draw time).  Because Special Agent LoPresti was not in a controlled test environment, awaiting a signal to prompt a draw-and-shoot response, but instead was in a busy public setting with no warning that he would conceivably need to employ deadly force, it is implausible that Special Agent LoPresti could physically process stimuli, decide to shoot, and mechanically discharge his weapon in less than 1.5 seconds.  Plaintiffs' ballistics expert also testified that the minimum draw time in these circumstances would have been between 1.5 and 3 seconds, depending on how quickly Special Agent LoPresti processes information and stimuli.

Consequently, Special Agent LoPresti did not and could not have discharged his weapon within one second of the impact.

100.   Based on these calculations, Special Agent LoPresti would not have had time to draw his weapon and discharge the fatal shot had the car been traveling faster than five miles per hour at and after it collided with Deputy Brewster.  Assuming the vehicle traveled 13 feet between impact and Special Agent LoPresti in 1.5 seconds, the car would have been traveling slightly over five miles per hour.  If the vehicle traveled 13 feet between impact and Special Agent LoPresti in two seconds, the vehicle would have been traveling at 4.4 miles per hour.

101.   Leggett's opinion as to speed is implausible, based on the known information about the fatal shot.  According to his calculations, Special Agent LoPresti had only between 0.7 and 0.9 seconds to perceive the threat to Deputy Brewster, unholster his weapon, aim, decide to employ deadly force, and shoot.  This time would be remarkable even in a controlled environment.

102.   Leggett's speed approximations also necessitate a host of physical consequences not borne out by the evidence.  *First,* the speeds posited by Leggett mean that Deputy Brewster was on the hood of the vehicle at a location beyond where Special Agent LoPresti fired the first shot, an implausible scenario given the Court's other findings.  For example, if two seconds elapsed between the impact and the first shot, and the car was traveling 11.5 miles per hour, then Deputy Brewster would have been carried 34 feet on the hood of the vehicle, well beyond the 13 feet between the impact site and the shooting site.  The same conclusion is required even if only one second elapsed before the first shot.  *Second,* it would have been impossible for Deputy Brewster to land on his feet, as he did, if the car was traveling more than 12 miles per hour.  Leggett conceded this on the stand and testified that he would also have expected Deputy Brewster to fall if the vehicle was traveling ten miles per hour.  The ease with which Deputy Brewster disengaged from the vehicle and took a shooting stance therefore further undermines Leggett's opinions about speed.  *Third,* Leggett admitted that,

according to his calculations, Deputy Brewster would have been on the hood of the vehicle for the first three of Special Agent LoPresti's shots, a possibility the Court rejects based on the witnesses' testimony and the fact that Special Agent LoPresti's bullets did not strike Deputy Brewster.  ***Fourth,*** at least some officers probably would have taken note of the vehicle sooner if it had been smoking and screeching its tires as Leggett suggested.

103.   Finding the vehicle traveled approximately five miles per hour is also consistent with witness testimony regarding lurching or bucking after impact and Deputy Brewster's observation that Champommier struggled to get the car into gear.  Leggett, testifying for the government, agreed that a car lurching or bucking in neutral, the gear he believed the vehicle to be in throughout the incident, would be traveling between three and four miles per hour.

104.   Certain of Leggett's opinions must also be viewed skeptically because they lack evidentiary support.  Specifically, Leggett relied on photographs included in Landerville's expert report and presupposed that certain marks were either caused by acceleration or braking.  He used these marks as illustrations to show that the marks at the scene were strictly acceleration marks.  But no evidence was presented to establish that Landerville or his associates created the marks in the manner Leggett presumed.  Landerville was not questioned about the source of the marks in the photographs he took, which easily could have been caused by acceleration where Leggett saw brake marks or vice versa.  Indeed, the marks could even have been caused by other vehicles.

105.   And while Leggett raised an appropriate point that the glass dispersion test offered into evidence by Landerville is not dispositive because it did not replicate the actual projectile used or the precise conditions of the shooting, the Court can compare the glass dispersion at the site of the first shot with the glass dispersion caused by later shots, when the vehicle was indisputably traveling faster.  The comparison indicates that at the time of first shot, Champommier's vehicle was traveling slower than when it turned the corner and began traveling east, consistent with Landerville's opinions.

106.   The evidence considered by the Court therefore supports a finding that the vehicle was traveling at approximately five miles per hour (on average) during the impact with Deputy Brewster and the first shot by Special Agent LoPresti.

### 3.    Champommier's Intentions

107.   The emphasis at trial on what happened before the impact was, in large part, a surrogate for competing narratives about Champommier's intentions.  The goal of Plaintiffs was to show that Champommier did not necessarily intend to strike Deputy Brewster.  Rather, he approached the activity in the parking lot, perhaps out of curiosity or perhaps to see if he could assist Oeters, and then lost control of his mother's car and reasonably sought to flee armed thugs.  Under this scenario Plaintiffs ask the Court to conclude by implication that Special Agent LoPresti's use of force was improper because he could not reasonably have concluded that Champommier was an immediate threat to Deputy Brewster or anyone else.

108.   The goal of the government was to show that Champommier intentionally tried to run down Deputy Brewster, and posed a threat to anyone in the parking lot. Implicit even in the government's contentions is that Champommier did so only because he believed that Oeters was threatened by armed thugs.  Ultimately, the issue of Champommier's intentions is largely irrelevant to this Court's ruling.  Nonetheless, certain findings are appropriate because they do relate to the reasonableness of Special Agent LoPresti's decision to shoot.

109.   The Court finds that Champommier could not reasonably have known that the police officers were, in fact, police officers.

110.   The Court finds that Champommier did not intend to kill Deputy Brewster. If Champommier had accelerated from where the Toyota Corolla was first observed, the speed would have been much greater.  Champommier had a problem with the manual transmission, but he could have floored the gas pedal, ignored the clutch, and "red-lined" the transmission.  Had he done so, Deputy Brewster would be dead or very seriously

injured.  As even the government's expert noted, the evidence is consistent with an attempt to draw attention or scare the officers, presumably to distract them from Oeters.

111.   The Court finds that the shooting was a mistake, in the lay sense of the word.  Had Special Agent LoPresti withheld his fire and announced himself as a police officer, then Champommier would have stopped the Toyota Corolla and surrendered.  This finding is supported by the testimony of Ms. Champommier about her son's character and background, and because the evidence suggests no reason for an intentional battery except concern for Oeters.

112.   The government raised issues as to the credibility of Oeters' testimony, received by the Court through deposition.  It is sufficient to note that Oeters' testimony is consistent with these Findings of Fact.  The Court would have reached the same Findings of Fact even if Oeters' deposition were disregarded.

113.   Likewise, the testimony of Roger Clark is consistent with these Findings of Fact, apart from where the Court specifically rejects his conclusions.  But the Court would have reached the same Findings of Fact even if Clark's testimony were disregarded.

## II. CONCLUSIONS OF LAW

114.   The FTCA vests federal courts with exclusive jurisdiction over claims against the United States government for certain losses and injuries for which it has waived sovereign immunity.  Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-2680 ("FTCA").  The "law enforcement proviso . . . extends the waiver of sovereign immunity to claims for six intentional torts, including assault and battery, that are based on the acts or omissions of investigative or law enforcement officers."  *Millbrook v. U.S.*, -- U.S. -- , 133 S.Ct. 1441, 1443 (2013) (quotation and citation omitted).  "Substantively, the FTCA makes the United States liable to the same extent as a private individual under like circumstances, under the law of the place where the tort occurred."  *Levin v. U.S.*, -- U.S. -- ,133 S.Ct. 1224 (2013).  Because the events in this matter occurred in California,

California law applies.  Under California law, officers and their employers can be held liable for battery and negligence in the use of deadly force.

## A.   Battery

115.   For liability to attach to a law enforcement officer's conduct undertaken in the scope of his employment, a plaintiff must prove the *prima facie* elements of battery and show that the force used was objectively unreasonable.  *See Edson v. City of Anaheim*, 63 Cal. App. 4th 1269, 1272-73, 74 Cal. Rptr. 2d 614 (1998) ("By definition then, a *prima facie* battery is not established unless and until plaintiff proves unreasonable force was used."); *see also* CACI 1305, Battery by Peace Officer.

116.   The applicable jury instruction, tailored for this case, would have been given in the following form:

Plaintiffs claim that Special Agent LoPresti harmed Zachary Champommier by using unreasonable force.  To establish this claim, Plaintiffs must prove all of the following:
(1) That Special Agent LoPresti intentionally touched Zachary Champommier or caused Zachary Champommier to be touched;
(2) That Special Agent LoPresti used unreasonable force against Zachary Champommier;
(3) That Zachary Champommier did not consent to the use of that force;
(4) That Zachary Champommier was harmed; and
(5) That Special Agent LoPresti's use of unreasonable force was a substantial factor in causing harm to Zachary Champommier.

A police officer may use reasonable force to arrest or detain a person when he or she has reasonable cause to believe that that person has committed a crime.  Even if the police officer is mistaken, a person being arrested or detained has a duty not to use force to resist the police officer unless the police officer is using unreasonable force.

In deciding whether Special Agent LoPresti used unreasonable force, you must determine the amount of force that would have appeared reasonable to a police officer in Special Agent LoPresti's position under the same or similar circumstances.  You should consider, among other factors, the following:

(a) The seriousness of the crime at issue;

(b) Whether Zachary Champommier reasonably appeared to pose an immediate threat to the safety of Deputy Brewster; and

(c) Whether Zachary Champommier was actively resisting arrest or attempting to evade arrest.

A police officer who makes or attempts to make an arrest is not required to retreat or cease from his or her efforts because of the resistance or threatened resistance of the person being arrested.

117. Reasonableness of a use of force by a police officer under California battery law is measured in part by referencing the Constitution and its protections, as elucidated in *Graham v. Connor.* 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed. 2d 443 (1989); *see Edson*, 63 Cal. App. 4th at 1273 (applying *Graham*).

118. As recently elaborated by the Ninth Circuit, the *Graham* factors (which are incorporated into the applicable California jury instruction) "are not exclusive and we must consider the totality of the circumstances." *Gonzalez v. City of Anaheim*, 715 F.3d 766, 769 (9th Cir. 2013). It may also be appropriate for courts to consider the availability of alternative means or other circumstances presented to officers at the scene. *See, e.g., Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (en banc).

119. The parties in this case do not dispute that *Graham* provides a non-exclusive analytical framework for assessing the reasonableness of force in the context of a California state law battery claim against a police officer.

120. The first *Graham* factor, seriousness of the suspected offense, generally weighs in an officer's favor if the officer has reason to believe that the individual had committed a felony. *Id.* at *3. The second *Graham* factor, immediacy of the threat posed to other officers or civilians, is characterized as the most important factor. *Id.* The third *Graham* factor, active resistance to arrest or flight, can be assessed in degrees.

*See Mattos v. Agarano*, 661 F.3d 433, 445 (9th Cir. 2011) (clutching steering wheel to prevent removal from a vehicle constitutes "some resistance to arrest.").

121.   "[I]t is not constitutionally unreasonable to prevent escape using deadly force where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Wilkinson v. Torres*, 610 F.3d 546, 550 (9th Cir. 2010) (quotation and citation omitted).  But, an officer "may not shoot to kill unless, at a minimum, the suspect presents an immediate threat to the officer or others, or is fleeing and his escape will result in a serious threat of injury to persons." *Harris v. Roderick*, 126 F.3d 1189, 1201 (9th Cir. 1997).

122.   Courts are directed to give "careful attention to the facts and circumstances of each particular case" noting that "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (citation omitted). Furthermore, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id.* at 396-97.  The reasonableness inquiry is therefore highly fact specific and objective.  *See Scott v. Harris*, 550 U.S. 372, 383, 127 S.Ct. 1769, 167 L.Ed. 2d 686 (2007) ("Although respondent's attempt to craft an easy-to-apply legal test in the Fourth Amendment context is admirable, in the end we must still slosh our way through the factbound morass of 'reasonableness.'").  "A reasonable use of deadly force encompasses a range of conduct, and the availability of a less-intrusive alternative will not render conduct unreasonable." *Wilkinson*, 610 F.3d at 551, citing *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994).

123.   "A police officer's use of deadly force is reasonable if 'the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.  Thus, 'an officer may reasonably use deadly force when he or she confronts an armed suspect in close proximity whose actions

indicate an intent to attack.'"  *Brown v. Ransweiler*, 171 Cal. App. 4th 516, 528, 89 Cal. Rptr. 3d 801(2009) (citations omitted).

124.   The Court is not aware of any analogous case law addressing the unique constellation of facts presented here and applying legal standards articulated by the Ninth Circuit.  Unlike many of the cases cited by the government, Champommier had not led officers on a car chase.  Special Agent LoPresti was not aware of any substantial, objective facts indicating that Champommier meant to harm any officers.  Champommier had no way of knowing that the members of the group were law enforcement officials.  No officers identified themselves to Champommier, and no officers expressed commands before shots were fired.  The officers had no suspicion of criminal activity by Champommier apart from the impact with Deputy Brewster itself.  Aside from the vehicle, there is no evidence that Champommier had a weapon.  Nor was Champommier driving toward any officers or civilians at the time of the fatal shot.  Contrary to the arguments of the United States, no *per se* rule operates to allow deadly force whenever a vehicle impacts a law enforcement officer.  Such a rule would allow a pedestrian officer to shoot and kill a motorist whose vehicle merely creeps into an intersection and touches an officer.

125.   An illustrative case for comparison is *Gonzalez v. City of Anaheim*, 715 F.3d 766 (9th Cir. 2013), a recent Ninth Circuit decision applying *Graham* to the use of deadly force against a motorist.  Although in closing arguments the government urged the Court to reach the same conclusion as the district court and later the Ninth Circuit in *Gonzalez*, it failed to account for the stark factual differences between the cases and the substantial legal implications of those differences.  In *Gonzalez*, uniformed patrol officers in a black and white police cruiser pulled Gonzalez over after observing him drive erratically.  *Id.* at 768.  During the traffic stop, Gonzalez exhibited bizarre and non-compliant behavior: he reached between seats (leading the officers to suspect he had a weapon), kept his fists clenched (concealing what the officers believed to be drugs), and repeatedly ignored the officer's commands.  *Id.*  The officers used

escalating levels of force, including baton strikes with a flash light and a sleeper hold, to address Gonzalez's affirmative non-compliance and physical resistance.  *Id.*  One of the officers entered the van and began punching Gonzalez, who responded by shifting his car into gear and driving away rapidly with the officer in his passenger seat.  *Id.*  The officer commanded Gonzalez to stop and attempted to knock the car out of gear.  *Id.* at 768-69.  When Gonzalez did not respond, the officer shot him.  *Id.* at 769.  The Ninth Circuit affirmed the district court's grant of summary judgment in the city's favor, concluding that the use of force was objectively reasonable in light of the facts.

126.   Here, there were no uniforms, commands, suspicions of criminal activity, acts of resistance, or escalations of force.  Deputy Brewster was not Champommier's captive, but instead slid off the vehicle freely onto his feet.  Acceleration posed no danger since no one was in the path of the Toyota Corolla and Deputy Brewster was sliding onto his feet.  The implication of the factual differences between these cases cannot be ignored – each factor that justified the shooting in *Gonzalez* militates in favor of the opposite conclusion on the facts currently before the Court.

127.   In denying summary judgment, the Court already distinguished *Wilkinson*, 610 F.3d 546.  On its face, *Wilkinson* is a powerful case for the government, because it involves an assaultive vehicle and makes its ruling as a matter of law over Judge Marshall's dissent.  *Id.* at 555.  However, each use of force is fact-specific.  Most importantly, *Wilkinson* involved uniform officers and a suspect who refused to obey a command to stop.

128.   In *Adams v. Speers*, 473 F.3d 989, 991 (9th Cir. 2007), the decedent led police on a chase, largely within the speed limit, for over an hour.  The decedent refused to stop even after his car was rammed twice.  *Id.* at 992.  Ultimately, an officer shot and killed the driver without warning.  *Id.*  The Ninth Circuit determined that no officer could conclude under those circumstances that deadly force was appropriate.  *Id.* at 993-94 ("[T]he absence of warning and the lack of danger to the shooter or others" render deadly force excessive).

129.    In *A.D. v. California Highway Patrol*, 712 F.3d 446, 453-57 (9th Cir. 2013), the Ninth Circuit recently affirmed a jury verdict in favor of the minor children of a decedent killed following a chase.  The issues and facts are not analogous here, because the case rested in large part on a jury finding that the officer in fact acted without a legitimate law enforcement objective.  This recent case does bolster the Court's conclusion that there is not a categorical rule that allows use of force, as argued by the government.

### B.    Negligence

130.    To prevail on Plaintiffs' claim for negligence (wrongful death) consistent with their allegations, Plaintiffs must prove that the officers breached a duty of care to Zachary Champommier, that he was harmed, and that the officers' negligence was a substantial factor in causing that harm.  *See* CACI 400; Cal. Civ. Code § 1714.  The Supreme Court of California recently clarified that liability may attach to negligent pre-shooting tactics by police officers under California law "if the tactical conduct and decisions leading up to the use of deadly force show, as part of the totality of circumstances, that the use of deadly force was unreasonable."  *Hayes v. County of San Diego, et al.*, 9th Cir. Case No. 09-55644, Slip Op. at 2 (Cal. Aug. 19, 2013).  The question certified in *Hayes* was specifically decided under the "law of negligence" and does not appear to impact California law as it pertains to battery by a peace officer.  *Id.* at 6 ("Under those state statutes, general principles of tort law, in particular the law of negligence, govern this case.").

### III.    APPLICATION OF LAW TO FACTS

### A.    Battery

131.    The Court must decide whether Plaintiffs established by a preponderance of evidence that Special Agent LoPresti's use of deadly force was objectively unreasonable under the particular circumstances of the shooting.  The facts of this case are undeniably tragic, comprised of a series of fateful coincidences and confusion, and complicated by a decided lack of criminal wrongdoing on the part of the decedent.  The

decisions made by the parties involved were necessarily rapid since the timing of events (both by happenstance and by the actors' choices) left little room for reflection.  But, the short duration of the altercation alone does not mitigate the countervailing evidence tending to show the force was unreasonable under any sensible interpretation of the facts.

132.   Accordingly, applying the *Graham* factors, binding Ninth Circuit case law, and California law of battery, the Court concludes that Special Agent LoPresti's use of deadly force against Champommier in response to the low-speed impact with Deputy Brewster was objectively unreasonable ***despite*** Special Agent LoPresti's reasonable belief that the impact was assaultive.  Special Agent LoPresti did not have sufficient cause to conclude that Champommier posed an immediate continuing threat of death or serious physical injury to Deputy Brewster when Special Agent LoPresti discharged his weapon.

133.   The facts relevant to the shooting can be summarized as follows: Special Agent LoPresti was providing backup for a minimally contentious investigatory stop of a pedestrian in a public parking lot.  His gun was holstered at his hip.  All involved officers were dressed in plain clothes, standing near unmarked police vehicles.  Special Agent LoPresti turned south toward the driving lane just in time to observe a low-speed impact between Champommier's vehicle and Deputy Brewster, who had his gun pointed toward the investigatory stop.  The collision was a complete surprise to all officers – only one officer had even noticed Champommier's vehicle prior to the impact.  Champommier was driving approximately five miles per hour (on average) against the posted flow of traffic.  Deputy Brewster vaulted onto the hood to avoid injury and stayed seated on the hood of the vehicle with his gun drawn for approximately one to two seconds.  Special Agent LoPresti concluded the impact was assaultive, unholstered his Glock pistol and fatally shot Champommier through the driver's side front window, all within at least two seconds of the impact.

-33-

134.   Although Deputy Brewster could have shot Champommier through the windshield while he was on the hood, he elected not to for his own safety.  As Special Agent LoPresti drew his pistol and shot Champommier, Deputy Brewster slid off of the vehicle into a standing position.  He was virtually uninjured and there were no officers or civilians in the path of the vehicle's travel.  Special Agent LoPresti then shot four more rounds at Champommier even though Deputy Brewster was safely standing to his north.  Deputy Brewster also fired a shot at Champommier from a standing position.  No warnings were given to Champommier and the officers did not identify themselves to Champommier as law enforcement at any time before shooting.  The later shots unquestionably lacked justification and constituted objectively unreasonable force, but those bullets did not strike Champommier.  Champommier died from the injuries caused by Special Agent LoPresti's first shot.

135.   With these facts in mind, the Court concludes that Special Agent LoPresti's first shot was objectively unreasonable.

### 1.  The first *Graham* factor

136.   The first *Graham* factor, seriousness of the suspected offense, weighs in favor of finding that the use of deadly force was reasonable, to a very limited degree.  As noted above, any felony is sufficient for this factor to count towards law enforcement.  As will be discussed below, Champommier could reasonably have been viewed as a suspect in an assault with a deadly weapon.  However, before the impact, Champommier was not suspected of committing any offense whatsoever.  He could not have been a suspect since he did not register in the officers' consciousness.  As a result, the only basis for asserting that Champommier was suspected of criminal activity would be the collision with Deputy Brewster.

### 2.  The second *Graham* factor

137.   The second *Graham* factor, whether Champommier reasonably appeared to pose an immediate threat to the safety of Deputy Brewster (or the other officers) is the most important factor by law and the most relevant on the facts of this case.

-34-

138.   This factor involves two questions:  (1) Could Special Agent LoPresti reasonably conclude that the collision with Deputy Brewster was intentional; and (2) if so, did Champommier continue to pose a risk after the collision?  Both questions are very close calls on the facts of this case.

139.   As to the issue of an intentional assault, both parties adduced a number of facts at trial and argued a number of points based on the evidence.  Plaintiffs argue that the officers did not observe the approach of Toyota Corolla and therefore any conclusion about an intentional assault was speculative and unreasonable.  Plaintiffs proffer alternative scenarios, all with some basis in the evidence.  For example, Champommier may have seen the plain clothed officers apparently harassing Oeters and decided to drive by for a closer look.  Distracted by Oeters' detainment, Champommier may not have seen Deputy Brewster until it was too late to stop the vehicle, causing the collision.  While it would have been prudent to stop under these circumstances, Champommier was face-to-face with the butt of Deputy Brewster's gun, not knowing that Deputy Brewster was an officer instead of a criminal.  In fact, lay witnesses testified that the group of officers actually looked like some kind of gang.  If the impact had been an accident, it is plausible Champommier did not stop because he was afraid.  Champommier's fear could have manifested in the panic Deputy Brewster observed.

140.   There is evidence to suggest that Special Agent LoPresti was, in fact, aware of the possibility that the collision was accidental.  He initially implied that the impact might not have been intentionally assaultive, stating that at some level he expected the driver to stop and apologize.  Plaintiffs attached considerably more weight to this statement than does the Court, but it is a reminder that the intentions of Champommier were inherently ambiguous.

141.   The government relies on the facts that Champommier's vehicle was going against the direction of traffic marked in the parking lot and struck Deputy Brewster in

1  a painted parking stall.  More broadly, the government does rely (and is entitled to rely)
2  on the perception of several officers that the impact was intentional.

3      142.   On this specific point, the Court concludes that Special Agent LoPresti
4  could reasonably believe that the impact was intentional, and therefore that Deputy
5  Brewster was the victim of an assault with a deadly weapon.  Apart from the position of
6  the Toyota Corolla, which is persuasive for the government, the Court must accept the
7  belief – or perhaps the intuition – of the witnesses.  They were there and the Court was
8  not.

9      143.   In the government's view, this reasonable belief should decide the case: As
10  a categorical matter of law, Special Agent LoPresti had the right to shoot if he
11  reasonably determined that Deputy Brewer had been intentionally struck.  The Court
12  rejected that view when summary judgment was denied and the Court rejects that view
13  now.

14      144.   The remaining question and most important question is whether a
15  reasonable officer in Special Agent LoPresti's position could objectively conclude that
16  deadly force was necessary in the immediate defense of life.

17      145.   The Court finds and concludes that no reasonable officer could conclude
18  that there was an immediate threat to life.  This finding and conclusion is based on the
19  following facts.

20      146.   *First,* Deputy Brewster was not seated on the hood at the time of the first
21  shoot.  Special Agent LoPresti's *only* basis for perceiving an immediate threat was
22  Deputy Brewster's continued presence on the hood of the Toyota Corolla.  Special
23  Agent LoPresti testified to that, and to his perception (quite mistaken) that Deputy
24  Brewster was on the hood of the Toyota Corolla through his shots.  Likewise,
25  government expert Ronald McCarthy testified that the shooting would be questionable
26  if Deputy Brewster was not on the vehicle.

27      147.   The Court has found that, at the time of the first shot, Deputy Brewster was
28  either not on the Toyota Corolla at all or was at the least in the process of sliding off a

very slow vehicle, virtually unharmed.  Although the Court should not second-guess a reasonable decision to shoot, the Court is not required to defer to a decision based on the mistaken belief that Deputy Brewster remained on the hood of the car for a considerable longer period than was possible.  Special Agent LoPresti either was severely mistaken in his perception at the time or a recollection since that is flatly mistaken.

148.   Special Agent LoPresti never articulated exactly **how** the death or disablement of the driver would assist Deputy Brewster.  The government suggested that the driver could have stopped abruptly, thrown Deputy Brewster off the hood, and then run him over.  Even this fanciful suggestion is dependent on Deputy Brewster's continued presence on the hood.  A more likely scenario would have been that Special Agent LoPresti believed that a disabled driver would have resulted in the vehicle slowing down so that Deputy Brewster could escape unharmed.  The vehicle was moving slowly and, again, Deputy Brewster was already safe at the time of the first shot.

149.   Showing every deference to Special Agent LoPresti, the threat had manifested and was abating.  The use of deadly force was therefore unnecessary to preserve Deputy Brewster's safety.  The shot was reactive, not protective.

150.   **Second,** the general policy of law enforcement is to recognize how ineffectual such shots are.  Exhibit 296 sets forth the policy that "use of firearms against moving motor vehicles is inherently dangerous and almost always ineffective."  Therefore, "an assaultive motor vehicle shall not presumptively justify a Department member's use of deadly force."  Although otherwise an excellent witness, Ronald McCarthy's attempt to minimize this policy was illogical and did not persuade the Court.

151.   **Third,** even the government's expert concluded that Special Agent LoPresti's final shots were objectively unreasonable.  Although Ronald McCarthy testified that the first shot was justified to defend Deputy Brewster's life, that testimony

is necessarily dependent on a conclusion that Deputy Brewster was still on the hood of the car.  In the absence of his presence, there is no real difference between the first and last shots.  Moreover, the willingness of Special Agent LoPresti to shoot unreasonably a few seconds later does cast doubt on his judgment to shoot at all.  This point, however, cannot be relied on too much because the focus must be on an objective officer, not on Special Agent LoPresti himself.

152.  **Fourth,** the failure of Deputy Brewster to shoot at first shows how ill-advised Special Agent LoPresti's shot was.  Deputy Brewster testified that he could have taken a clear shot at Champommier while he was on the hood of the vehicle and chose not to do so.  Deputy Brewster testified that he "decided it was more prudent to get off the hood while [he] could" since shooting the driver might place him at a greater risk than he was in already.  (Trial Trans. 5:50:2-3).  The law is that Special Agent LoPresti was not required to choose the best course of action or use lesser force if deadly force was justified.  However, Deputy Brewster's decision not to shoot is some evidence of the objectively unreasonableness of Special Agent LoPresti's shot.  The Court acknowledges that Deputy Brewster shot later, but that shot was also objectively unreasonable.

153.  **Fifth,** the shot was taken with no warnings whatsoever.  Had Special Agent LoPresti identified himself and demanded that Champommier stop, then Champommier would have done so.  Again, no one, including Special Agent LoPresti, has articulated why an **immediate** shot was necessary to save Deputy Brewster's life.

154.  **Sixth,** the Court gives no weight to the argument that the shot was necessary to protect the life of other officers.  Ronald McCarthy relied on that theory but with no evidentiary support in the facts that the trial actually developed.  No one but Deputy Brewster was at risk.  At a minimum, there was no threat so immediate that Special Agent LoPresti could dispense with a warning.  Indeed, it is only the government and McCarthy that argued this point – Special Agent LoPresti testified that he was only concerned about Deputy Brewster.

155.   The government argues that Deputy Brewster did shoot.  That shot is objectively unreasonable.  Special Agent Fromson and Special Agent Caruth testified that also would have shot if they could have obtained a clear line of sight.  However, again, they did not articulate precisely how those shots would have assisted Deputy Brewster or anyone else.

156.   Ultimately, the government's argument is no different at trial than it was at summary judgment.  Again, the Court rejects any categorical rule.  Special Agent LoPresti was not faced with a situation analogous to a suspect armed with a gun. Vehicles are used as deadly weapons, but they are distinct from guns in their everyday public use and in their operation when employed as weapons.  The presence of a gun may itself be construed as a deadly threat in many contexts, and a suspect with a gun can do near-instant fatal damage to anyone in the near vicinity.  There were no potential victims in the vehicle's path when Special Agent LoPresti shot Champommier and any threat would take at least a number of seconds to manifest.  The only person impacted by the vehicle, Deputy Brewster, was unharmed and moving to a place of safety. Champommier was driving away from the officers.  Consequently, there was no objective foundation for concluding that Champommier and his vehicle posed a continuing threat to anyone in the lot.

157.   Giving due weight to the pressure of making split-second, life or death decisions, the Court nonetheless finds and concludes that no one was immediately threatened with death or serious bodily harm.

### 3.  The third *Graham* factor

158.    The above analysis is equally applicable to the third *Graham* factor, which is active resistance to arrest or flight.  This factor weighs in favor of finding that the use of deadly force was unreasonable.  This factor is as strong in Plaintiffs' favor as the first – to say a person actively resisted arrest when there was no obvious police presence fundamentally defies logic and verges on the Orwellian.  Champommier's last act was an attempt to comply with police commands once authoritatively given.  Had the

1   officers verbalized those commands before shooting, Champommier would likely be
2   alive today.

3       159.   Accordingly, the Court finds and concludes that Special Agent LoPresti's
4   use of deadly force against Champommier was objectively unreasonable.

5       160.   All other elements of Plaintiffs' battery claim under the FTCA are met.

6   **B.    Negligence**

7       161.   Plaintiffs have failed to show that the officers breached a duty of care by
8   debriefing in a public parking lot, which was the only theory of negligence tried to the
9   Court.   (*See* Final Pretrial Conference Order at 4).   Plaintiffs failed in their burden to
10  prove that the decision to meet at the location deviated from any established standard of
11  care.   Moreover, the officers acted reasonably in regard to Oeters, whose peculiar
12  behavior justified both further investigation and then an investigative stop pursuant to
13  *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed. 2d 889 (1968).

14      162.   In regard to the negligence issues, the Court finds that the testimony of
15  Ronald McCarthy was more credible and supported in the evidence than the testimony
16  of Roger Clark.

17      163.   Common sense also dictates that Plaintiffs failed to meet their burden.
18  Police officers have the legal right to carry concealed firearms while off-duty and
19  typically do so.   If the officers had met, say, to celebrate Special Agent LoPresti's
20  birthday, they also would have been in street clothes and armed.   Observing Oeters
21  while off-duty, they still would have investigated.   While it is true that the Task Force
22  officers were there because of the decision to debrief, that purpose by itself did not lead
23  to the tragic events here.   The suggestion by Roger Clark that they should have called
24  uniformed LAPD officers was lacking in support and can only be viewed as his own
25  personal belief in a "best practice" that is not required by California law, or even very
26  sensible.

27      164.   *Hayes* decisively opens the door for courts and juries to consider pre-
28  shooting decisions and tactics when evaluating whether a use of deadly force was

-40-

negligent under California law.  In this regard, it is helpful to the Plaintiffs in a broad sense.  *Hayes* allows for the possibility of a finding of negligence based on the totality of circumstances including if the officers' somehow provoked Champommier to drive to the scene or to drive his car towards Deputy Brewster.  Factually, however, there is no basis for finding the type of provocation at issue in *Hayes* or the cases it considers.

165.   It could be argued that the facts considered in assessing Plaintiffs' battery claim would also support a finding of liability for negligence, but Plaintiffs' inclusion of the negligence claim was specifically targeted at the officers' pre-shooting tactical decision to meet in the parking lot.  (Final Pre-trial Conference Order at 4 ("The task force's meeting in a busy public parking lot shortly after nine o'clock on a summer Thursday evening, in plain clothes and with plain cars, unreasonably created a dangerous condition.  The assault and shooting of Zachary arose from the chaos these federal agents negligently created.")).

166.   Given the uncertainty of California law at the time of the Final Pretrial Conference, it is understandable that Plaintiffs' counsel directed their negligence claim at pre-shooting conduct, divorced from Special Agent LoPresti's use of deadly force. But that is no longer appropriate in light of *Hayes* unless the pre-shooting tactics or decisions themselves resulted in independent injury.  *Hayes*, Slip Op. at 8 (where the only injury alleged is a loss of life, a "case involves only a single indivisible cause of action, seeking recovery for a single wrong – the shooting itself.").  Instead, because a single injury is alleged, the officers' decision to debrief in the parking lot "is only relevant here to the extent it shows, as part of the totality of circumstances, that the shooting itself was negligent."  *Id.* at 9.  Therefore, it would not be appropriate to award the same damages under both of Plaintiffs' claims.

## IV.   DAMAGES

167.   Total economic damages are $6,172.61 for burial expenses and funeral costs and are awarded to Ms. Champommier.

168.    Plaintiffs are also entitled to non-economic damages to compensate their loss of their son's "love, companionship, comfort, care, assistance, protection, affection, society and moral support."  CACI  2-3921.  The award of non-economic damages should take into account the remainder of Plaintiffs' lives and be determined in the amount of current dollars at the time of judgment, not reduced to present cash value.  *Id.* The award of non-economic damages does ***not*** include the grief and suffering of Plaintiffs.  The award of non-economic damages is also not meant to punish the United States of America or "send a message".

169.    Both Plaintiffs have a life expectancy of 33 years.

170.    Counsel for both Plaintiffs jointly suggested that an amount be awarded to Ms. Champommier and then a percentage of that amount be awarded to Mr. Feldman. Counsel suggested 75%.

171.    The Court agrees in general with the suggested approach, which is also sanctioned by California law.  However, Mr. Feldman does not deserve 75%.  The Court does not presume to say that one parent loved Champommier more, but grief is not a recoverable item.  Ms. Champommier was the custodial parent.  The testimony at trial established that Champommier always would have been more central to Ms. Champommier's life than to Mr. Feldman's life.  The Court is certain that the temporary estrangement between Champommier and his father would have quickly come to an end.

172.    Based on all of the evidence, an appropriate percentage is 50%.

# V. <u>VERDICT</u>

The Court finds and rules as follows

1.  On Plaintiffs' Claim 1 for wrongful death (negligence):  In favor of Defendant.

2.  On Plaintiff's Claim 2 for battery:  In favor of Plaintiffs.

3.  Plaintiff Carol Champommier is awarded $6,172.61 in economic damages and $2,000,000.00 in non-economic damages.

4.  Plaintiff Eric Feldman is awarded $1,000,000.00 in non-economic damages.

The Court will enter a separate judgment pursuant to Rules 54 and 58(b) of the Federal Rules of Civil Procedure.

Dated:  August 21, 2013                    MICHAEL W. FITZGERALD
                                           United States District Judge